## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
                                    )
NOBLE ENERGY, INC.,                 )
                                    )
          Plaintiff,                )
                                    )
              v.                    )
                                    )Civil Action No. 09-2013 (EGS)
KENNETH SALAZAR, Secretary          )
of the Department                   )
of the Interior, and U.S.           )
DEPARTMENT OF THE INTERIOR,         )
                                    )
          Defendants.               )
                                    )
```

## MEMORANDUM OPINION

This case arises out of long-running litigation over oil and gas leases off the coast of California.  Plaintiff Noble Energy ("Noble") challenges an order of the Minerals Management Service ("MMS"), an agency of the Department of the Interior, which directs Noble to permanently plug and abandon an undeveloped exploratory well.  Noble asserts that this order was arbitrary, capricious, and contrary to law, and asks this Court to declare that it is not obligated to decommission its well.

Pending before the Court are the parties' cross-motions for summary judgment.  Upon consideration of these cross-motions, the oppositions and replies thereto, the parties' supplemental briefs, the applicable law, the full administrative record in this case, the statements made by counsel at a motions hearing held on February 15, 2011, and for the reasons set forth below, this Court finds that MMS acted within its authority under the

OCSLA to order Noble to permanently plug and abandon its exploratory well.  Accordingly, the plaintiff's motion for summary judgment is hereby **DENIED** and the federal defendants' cross-motion for summary judgment is hereby **GRANTED.**

I. **BACKGROUND**

   A. **Statutory and Regulatory Background**

   The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, gives the United States jurisdiction over the mineral resources found in submerged lands in the Outer Continental Shelf ("OCS").[1]  *See* 43 U.S.C. § 1332(1).  The Secretary of the Interior controls the disposition of mineral resources in the OCS through oil and gas leases.[2]  *See id.* § 1337(a)(1).  An OCS lease gives a lessee an exclusive right "to explore, develop and produce the oil and gas contained within the leased area," *id.* § 1337(b)(4), in exchange for an up-front payment, annual rental fees, and royalties on any oil and gas that is ultimately produced.[3]  *See id.* §§ 1337(b)(3),(6),(7).

   _____

   [1]   Each coastal state has jurisdiction over the submerged lands beneath navigable waters within a fixed distance from its coastline.  *See* 43 U.S.C. §§ 1311, 1301(a) (defining "lands beneath navigable waters").  The federal lands beyond these boundaries are known as the Outer Continental Shelf.  *Id.* § 1331(a).

   [2]   The Secretary has delegated his responsibilities under the OCSLA to MMS.  30 C.F.R. § 250.101.

   [3]   An OCS lease runs initially for a primary term of not more than ten years, as specified in the lease instrument.  43

Regulations under the OCSLA establish the general requirements for permanently plugging and abandoning (or, "decommissioning") a well drilled pursuant to an OCS lease. *See generally* 30 C.F.R. §§ 250.1700-1754. These requirements include permanently plugging all wells, removing all platforms and other facilities, decommissioning all pipelines, clearing the sea floor of all obstructions, and conducting all decommissioning activities in a way that is safe and does not cause undue harm or damage to the human, marine, or coastal environment. *See id.* § 250.1703. The regulations also specify the circumstances under which decommissioning obligations are accrued:

> You[4] accrue decommissioning obligations when you do any of the following:
>
> (a) Drill a well;
> (b) Install a platform, pipeline, or other facility;
> (c) Create an obstruction to other users of the OCS;
> (d) Are or become a lessee or the owner of operating

---

U.S.C. § 1337(b)(2)(B). The lease continues in effect thereafter as long as oil or gas is being produced in paying quantities or as long as approved drilling operations are conducted. *Id.* Lease suspensions may be issued at the request of a lessee to facilitate proper development, *id.* § 1334(a)(1)(A), or may be directed by MMS, 30 C.F.R. § 250.168(a). Both types of lease suspensions may extend the lease beyond its initial term. 30 C.F.R. §§ 250.169(a); 256.73(a).

[4] In this subpart, the term "you" refers, *inter alia*, to "lessees and owners of operating rights." 30 C.F.R. § 250.1701(c). The OCSLA regulations further define a "lessee" as "a person who has entered into a lease with the United States to explore for, develop, and produce the leased minerals. The term lessee also includes the MMS-approved assignee of the lease, and the owner or the MMS-approved assignee of operating rights for the lease." *Id.* § 250.105.

rights of a lease on which there is a well that
has not been permanently plugged . . . , a
platform, a lease term pipeline, or other
facility, or an obstruction;

(e) Are or become the holder of a pipeline right-of-way
on which there is a pipeline, platform, or other
facility, or an obstruction; or

(f) Re-enter a well that was previously plugged
according to this subpart.

*Id.* § 250.1702.

Under the regulatory structure of the OCSLA, once a lessee
accrues decommissioning obligations in the manner provided under
§ 250.1702, it retains those obligations notwithstanding
transfer, assignment, or relinquishment of the lease. *See id.*
§ 256.62(d) ("You, as assignor, are liable for all obligations
that accrue under your lease before the date that the Regional
Director approves your request for assignment . . . The Regional
Director's approval of the assignment does not relieve you of
accrued lease obligations that your assignee, or a subsequent
assignee, fails to perform."); *id.* § 256.64(a)(5) ("You do not
gain a release of any nonmonetary obligation under your lease or
the regulations in this chapter by . . . transferring operating
rights."); *id.* § 256.64(h)(1) ("You are jointly and severally
liable for the performance of each nonmonetary obligation under
the lease and under the regulations in this chapter with each
prior lessee and with each operating rights owner holding an
interest at the time the obligation accrued."); *id.* § 256.76 ("A
relinquishment shall take effect on the date it is filed subject

to the continued obligation of the lessee and the surety to . . .
abandon all wells and condition or remove all platforms and other
facilities on the land to be relinquished to the satisfaction of
the Director.").

The OCSLA regulations further provide that "[l]essees and
owners of operating rights are jointly and severally responsible
for meeting decommissioning obligations for facilities on leases
. . . as the obligations accrue and until each obligation is
met." *Id.* § 250.1701(a). All wells on a lease must be
permanently plugged "within 1 year after the lease terminates."
*Id.* § 250.1710

Wells drilled pursuant to an OCS lease may also be
temporarily plugged and abandoned when necessary for proper
development and production of a lease. *See id.* § 250.1721.
However, the OCSLA regulations provide that if MMS or the lessee
determines that continued maintenance of a temporarily abandoned
well "is not necessary for the proper development or production
of a lease, [the lessee] must . . . [p]romptly and permanently
plug the well." *Id.* § 250.1723.

**B. Factual and Procedural Background**

The litigation preceding this case began in 1999 and spans
the Ninth Circuit, the Federal Circuit, and now this Court. *See
Amber Res. Co. v. United States*, 538 F.3d 1358 (Fed. Cir. 2008)
("*Amber III*"); *California v. Norton*, 311 F.3d 1162 (9th Cir.

5

2002); *California v. Norton*, 150 F. Supp. 2d 1046 (N.D. Cal. 2001); *Amber Res. Co. v. United States*, 73 Fed. Cl. 738 (2006) ("*Amber II*"); *Amber Res. Co. v. United States*, 68 Fed. Cl. 535 (2005) ("*Amber I*").[5]  The extensive factual and procedural background of this case has been thoroughly documented by other courts, and this Court will not repeat it at length here.

In sum, the Federal Circuit recently affirmed that the United States materially breached thirty-five OCS leases when it suspended them, indefinitely, in an effort to comply with procedures and standards imposed by 1990 amendments to the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1456(c)(1).[6] *See Amber III*, 538 F.3d at 1374.  As a result of the Federal Circuit's decision in *Amber III*, the plaintiffs in that case - consisting of numerous OCS lessees, including Noble Energy - have since recovered in restitution the original up-front bonus payments on their OCS leases.  Tr. at 3.  Plaintiff Noble, specifically, has recovered $1.2 million in restitution for its portion of the original bonus payment on Lease 320, the subject of the instant lawsuit.  Tr. at 3.

---

[5]    The federal government's combined petition for panel rehearing or rehearing en banc was denied by the Federal Circuit on December 5, 2008.  *Amber Res. Co. v. United States*, No. 2007-5047 (Fed. Cir. Dec. 5, 2008).  The federal defendants have not sought Supreme Court review.

[6]    During a "directed" suspension, such as the suspensions at issue in *Amber Resources*, no activities on the lease are permitted.  *See Amber III*, 538 F.3d at 1363.

Lease 320 was issued by the United States for oil and gas development in 1979 and is located off the coast of central California.[7] *See* NOB0001-0007.[8]  In 1985, an exploratory well was drilled on Lease 320 - the well at issue in this case, referred to by the parties as the "320-2" well - which proved to be capable of producing oil and gas in commercial quantities. *See* NOB0458.  Shortly after the 320-2 well was drilled and tested, MMS approved a plan to temporarily plug the 320-2 well for a one-year period.  *See* NOB0487.  The lessees[9] subsequently sought and were granted numerous extensions of the well's temporarily abandoned status.  *See* NOB0490; 0492; 0717; 0734; 0823; 0835; 0866; 0867.  The administrative record indicates that the lessees expressed an intent to permanently abandon the 320-2 well in 1990, *see* NOB0743, and again in 2004, *see* NOB0908.  To date, however, the 320-2 well remains only "temporarily"

---

[7]    Lease 320 along with adjacent Leases 319, 322, and 323, form the "Sword Unit." *See* NOB0151.  The OCSLA and its regulations permit lessees voluntarily to join their leases into "units" when doing so will "[p]romote and expedite exploration and development."  30 C.F.R. § 250.1301(a)(1).  A single company is designated the "unit operator," and, subject to the terms of the lessees' agreements, is given primary responsibility for unit operations.  Plaintiff Noble is the current Sword Unit operator.

[8]    References to the administrative record are indicated by "NOB___."

[9]    References herein to "the lessees" include both plaintiff Noble and its predecessors-in-interest, Conoco and Samedan Oil.  Conoco drilled the 320-2 well in 1985.  *See* NOB0458.

plugged.[10]

On September 1, 2009, following the resolution of the *Amber Resources* litigation, MMS sent a letter to Noble invoking the agency's regulatory authority under the OCSLA to order Noble to "promptly and permanently" plug and abandon the 320-2 well. *See* NOB0941. The letter reads, in relevant part:

> The purpose of this letter is to notify you of outstanding decommissioning obligations that exist on one of your OCS leases. Our records indicate that your Well OCS P-0320, No. 2, has not been permanently abandoned. The Minerals Management Service (MMS) has determined that there is no longer justification for maintaining the well in temporarily abandoned status. Therefore, as required by 30 CFR 250.1723, you must: promptly and permanently plug the well according to 250.1715; clear the well site according to 250.1740 through 250.1742; and perform any additional activity necessary to fully satisfy your decommissioning obligations.

NOB0941.

Noble responded by declining to comply with the agency's order, *see* NOB0942, and it filed its complaint initiating this lawsuit on October 26, 2009. Complaint, Doc. No. 1. Plaintiff filed a motion for summary judgment on March 1, 2010. *See* Plaintiff Noble Energy, Inc.'s Motion for Summary Judgment, Doc. No. 10 ("Pl. Mot."). The federal defendants filed a cross-motion for summary judgment on April 5, 2010. *See* Defendants' Cross-

---

[10]     The parties represent that all of the remaining exploratory wells in the Sword Unit have been permanently plugged and abandoned in accordance with the OCSLA regulations. Tr. at 8-9.

Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment, Doc. No. 11 ("Def. Mot."). The Court held a hearing on the parties' cross-motions on February 15, 2011. Accordingly, these motions are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides a right to judicial review of final agency actions. Under the APA, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). To make this finding, the court must determine whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (citing *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

The standard of review under the APA is a narrow one. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Generally, the court is not empowered to substitute its judgment for that of the agency. *Id.* Moreover, an agency is entitled to particular deference in interpreting and applying its own regulations, unless its interpretation is plainly erroneous.

*Stinson v. United States*, 508 U.S. 36, 45 (1993). However, the

level of deference granted to an agency's decision also depends

on whether the agency's conclusion is based on factual

interpretation or is purely a question of law. *See Beverly*

*Enter., Inc. v. Herman*, 130 F. Supp. 2d 1, 12 (D.D.C. 2000). If

the agency's finding concerns a purely legal question, "the court

reviews the finding *de novo* to ensure the agency does not exceed

its authority." *Id.* at 13.

## III. DISCUSSION

Plaintiff Noble seeks a declaratory judgment that MMS's

September 1, 2009 decommissioning order exceeds the scope of its

authority under the OCSLA and that Noble and its co-lessees are

not obligated to permanently plug and abandon the 320-2 well.[11]

Specifically, plaintiff argues that any contractual or regulatory

decommissioning obligations it may have had pursuant to Lease 320

were discharged by the government's material breach of the lease,

as determined by the Court of Federal Claims and the Federal

Circuit. The federal defendants, by contrast, assert that,

pursuant to the OCSLA regulations, plaintiff retains the

decommissioning obligations it has accrued, which survive the

---

[11] The federal defendants contend that Noble does not have
standing to request declaratory relief on behalf of its co-
lessees, who are not parties to this case. *See* Def. Mot. at 25-
26. As the Court concludes that plaintiff is not entitled to any
declaratory relief, it will not consider whether such relief
would extend to plaintiff's co-lessees.

termination of the lease.

Before reaching the merits, however, the Court must address two threshold issues raised by the federal defendants. First, the federal defendants assert that this Court lacks jurisdiction to hear this case because plaintiff's claim is essentially a contract claim against the federal government, over which the Court of Federal Claims has exclusive jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491. Second, the federal defendants argue that plaintiffs are precluded from re-litigating a claim for "reliance" damages, including the cost of plugging and abandoning the 320-2 well, which the federal defendants contend was denied by the Federal Circuit in the *Amber Resources* litigation. The Court will explore these issues in turn.

### A.    Subject-Matter Jurisdiction

The federal defendants assert that this Court lacks subject-matter jurisdiction over plaintiff's APA claim because plaintiff's claim is impliedly forbidden by the Tucker Act, which gives the Court of Federal Claims exclusive jurisdiction over all claims for monetary relief in excess of $10,000 founded upon an alleged contract with the United States. *See* Def. Mot. at 12 (citing 28 U.S.C. §§ 1346(a)(2), 1491(a)(1)). As the D.C. Circuit has repeatedly affirmed, an action against the United States which is "at its essence" a contract claim lies within the scope of the Tucker Act, and "a district court has no power to

grant injunctive relief in such a case." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68-69 (D.C. Cir. 2004) ("[T]he Tucker Act 'impliedly forbids - in APA terms - not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.'" (citation omitted)).

Whether a claim is "at its essence" a contract claim for Tucker Act purposes depends "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968. According to the federal defendants, both elements of this test support a conclusion that plaintiff's claim sounds in contract. First, the federal defendants assert that plaintiff's claimed right of discharge "relies on a contract (breach thereof) and contract law" and, therefore, contract law creates the substantive right to the remedy plaintiff seeks. Def. Mot. at 12. Second, while the plaintiff's complaint does not seek monetary relief on its face, the federal defendants argue that plaintiff's request for declaratory relief is essentially a claim seeking money damages because the practical effect of a declaratory judgment would purportedly be to require the United States to pay plugging and abandonment costs that plaintiff would otherwise incur. Def. Mot. at 13. In other words, the federal

defendants assert, plaintiff cannot "avoid the remedial restrictions of the Tucker Act by recasting cases that are essentially damages actions as requests for injunctive or declaratory relief." *Prof. Managers' Ass'n v. United States*, 761 F.2d 740, 745 n.4 (D.C. Cir. 1985).

After careful consideration of these arguments, the Court finds that it has jurisdiction to hear plaintiff's claim. The OCSLA specifically provides that "the district courts of the United States shall have jurisdiction [over] cases and controversies arising out of, or in connection with . . . the cancellation, suspension, or termination of a lease or permit under this Act."[12]  43 U.S.C. § 1349(b)(1).  To the extent this case arises out of, or in connection with, the termination of an OCS lease, the OCSLA therefore expressly authorizes this Court's jurisdiction.[13]

_____

[12]    The OCSLA further provides that "[p]roceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose."  43 U.S.C. § 1349(b)(1).  As the defendants in this case are the Secretary of the Interior and a department of the federal government, venue is also proper in this Court.

[13]    The term "termination" is not defined in the OCSLA regulations.  The primary regulatory mechanisms for terminating a lease are relinquishment, under 30 C.F.R. § 256.76, or cancellation, under 30 C.F.R. § 256.77.  The federal defendants take the position that Lease 320 was relinquished pursuant to this provision; plaintiff argues that the lease was not relinquished but has been rescinded as a matter of law.  Tr. at 67-68.  The administrative record does not indicate that the parties engaged in any formal "relinquishment" process under 30

13

Moreover, even assuming this Court's jurisdiction were not expressly authorized by statute, the Court concludes that plaintiff's claim is not a contract claim within the scope of the Tucker Act. Plaintiff does not seek to enforce its rights under the terms of Lease 320, nor does it ask this Court to determine whether the federal government violated its contractual obligations. Rather, plaintiff challenges a specific agency action ordering Noble to promptly and permanently plug and abandon an exploratory well.[14] The central question before this Court on the merits is whether MMS properly exercised its authority to issue such an order under the OCSLA. This question falls squarely within the scope of APA review.

The Court's determination is further guided by the D.C. Circuit's decision in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), which held that the district court erred when it determined that it did not have jurisdiction to hear a claim

_____

C.F.R. § 256.76. The Court is inclined to agree with the plaintiff that Lease 320 was rescinded as a matter of law, pursuant to the courts' decisions in *Amber Resources*. The Court concludes, however, that it need not resolve this question to decide this case.

[14]    As the Court of Federal Claims noted in *Amber II*, "it is basic to litigation under the Tucker Act that actions are brought against the United States, not Congress, not particular Executive agencies, and not the courts." 73 Fed. Cl. at 751 (citing 28 U.S.C. § 1491(a)(1)). The fact that plaintiff has challenged a particular action of a specific federal agency therefore precludes the Court of Federal Claims' jurisdiction under the Tucker Act.

seeking injunctive relief under the APA where the plaintiff "does not claim a breach of contract, . . . it seeks no monetary damages against the United States, and its claim is not properly characterized as one for specific performance." *Id.* at 969. In that case, the court found that

> Appellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act. . . . [W]e do not accept the Government's argument that the mere existence of such contract-related issues must convert this action to one based on the contract.

*Id.* Here, as in *Megapulse*, the fact that the Court may have to consider contract-related issues does not deprive it of jurisdiction over plaintiff's APA claim. Accordingly, the Court concludes that it has subject-matter jurisdiction.

## B. Claim Preclusion

Next, the federal defendants assert that, even if this Court has subject-matter jurisdiction, plaintiff's claim is nonetheless precluded because plaintiff has already attempted to recover the costs of plugging and abandoning exploratory wells, including the 320-2 well, as part of the *Amber Resources* litigation.[15] *See*

---

[15] The federal defendants also argue that plaintiff's claim is barred on the basis of "judicial estoppel," which "prevents parties from abusing the legal system by taking a position in one legal proceeding that is inconsistent with a position taken in a later proceeding." Def. Mot. at 22-23 (citing *Duvall v. Bumbray*, 423 B.R. 383, 390 (D.D.C. 2010)). Aside from this passing reference to the doctrine, the federal defendants do not explain how the doctrine of judicial estoppel applies to the case before the Court. The Court, therefore,

Def. Mot. at 22.  In *Amber Resources*, the Court of Federal Claims

ruled, and the Federal Circuit affirmed, that the OCS lessees

could not recover "sunk costs," such as the costs of development

and exploration, under their chosen remedy of restitution because

those costs are only recoverable as reliance damages.  *See Amber*

*II*, 73 Fed. Cl. at 757-58; *Amber III*, 538 F.3d at 1381.  The

federal defendants contend that the election-of-remedies doctrine

similarly prohibits Noble from now attempting to recover the

additional "reliance" damages that were rejected by the *Amber*

*Resources* court.  *See* Def. Mot. at 22 (citing *Amber II*, 73 Fed.

Cl. at 748, n.10 ("'As a general rule, a plaintiff may not

recover both restitution and reliance damages for breach of

contract.'")(citation omitted))).

The Court finds that even if plaintiff previously sought to

recover money damages for the future costs of plugging and

abandoning the 320-2 well,[16] plaintiff's claim is not precluded

---

finds no reason to bar plaintiff's claim on grounds of judicial
estoppel.

[16]     The Court notes that the parties disagree about whether
plaintiff actually sought to recover the costs of permanently
plugging and abandoning the 320-2 well in *Amber Resources*.  The
federal defendants argue that the costs of plugging and
abandoning the 320-2 well are included in the $727 million in
additional "sunk costs" (*i.e.*, amounts spent on developing the
leases) that the Court of Federal Claims rejected as
unrecoverable reliance damages in *Amber II*, 73 Fed. Cl. at
757-58, because "plugging an exploratory well is part of
exploration."  Def. Supp. Mem., Doc. No. 24, at 5, n.3.  Record
evidence demonstrates that plaintiff did contemplate seeking
recovery for this particular expense, and Noble concedes as much.

because it does not seek to do so in <u>this</u> case. Plaintiff's complaint does not seek money damages on its face, nor is the Court persuaded that plaintiff is seeking money damages under the guise of equitable relief. Here, a declaratory judgment in plaintiff's favor would merely relieve plaintiff of an obligation that would have required a financial outlay. The Court declines to find that this avoided expenditure constitutes "money damages." *See, e.g.*, *Md. Dep't of Human Res. v. Dep't of Health and Human Serv.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (finding that the ordinary meaning of the term "money damages" refers to a "sum of money used as compensatory relief"). Accordingly, the Court concludes that plaintiff's claim is not barred as a result of proceedings in the Court of Federal Claims.

## C.  Merits

Having concluded that plaintiff's APA claim is properly before this Court on review, the Court now turns to the merits of that claim. Plaintiff contends that MMS's September 1, 2009 decommissioning order is arbitrary, capricious, an abuse of

---

*See* Pl. Reply, Doc. No. 14, at 13. Plaintiff, however, asserts that it ultimately did not seek recovery for the future costs of plugging and abandoning the 320-2 well in the Court of Federal Claims, although it unsuccessfully sought to recover its past, pre-material breach expenditures on other exploratory wells, including those that had already been permanently plugged and abandoned. *See* Pl. Reply at 14. The *Amber Resources* opinions provide no clarity, as they do not specifically address plugging and abandonment costs. The Court concludes that it need not resolve this question.

discretion, and otherwise not in accordance with law because the OCSLA regulations do not authorize the agency to order Noble to permanently plug and abandon the 320-2 well in light of the government's material breach of the lease. Specifically, plaintiff argues that the government's material breach discharged any remaining contractual or regulatory obligations that Noble had as a result of Lease 320.

Section 22 of Lease 320 requires Noble and its co-lessees to "remove all devices, works, and structures" from the leased area upon termination of the lease. NOB0004. Under normal circumstances, plaintiff concedes, that provision would require Noble and its co-lessees permanently to plug and abandon all exploratory wells, including the 320-2 well. *See* Pl. Mot. at 17. However, well-established common law principles provide that a material breach of contract discharges all of the non-breaching party's remaining contractual obligations. *See* Restatement (Second) of Contracts § 237, cmt. a ("[M]aterial failure of performance has . . . these effects on the other party's remaining duties of performance with respect to the exchange. It prevents performance of those duties from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur."). Therefore, given the prior courts' conclusions in *Amber Resources* that the government totally and materially breached Lease 320 and

other offshore leases as a result of the CZMA amendments, plaintiff argues that it is no longer obligated to decommission the 320-2 well. *See* Pl. Mot. at 19 (citing 13 *Williston on Contracts* § 39:38 (4th ed. 2009) ("a breach of contract . . . entitles the nondefaulting party to walk away from the contract without liability")).

Plaintiff's argument rests primarily on what it terms the "*Texas* doctrine." This doctrine, which was set forth by the Supreme Court in *United States v. Texas*, provides that "[s]tatutes . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." Pl. Mot. at 21 (citing *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotations omitted)).[17] Here, plaintiff argues, because nothing in the OCSLA expresses a clear intent to abrogate the common law principle of discharge, that principle continues to govern OCS leases, including Lease 320.

The Court recognizes that OCS leases are governed by common law contract principles, such as the principle of discharge. *See Mobil Oil Exploration and Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607 (2000) ("When the United States enters

---

[17]     Although plaintiff has cited to numerous cases applying the *Texas* doctrine, only one of these cases arises in the context of the OCSLA, and none address the common law principle of discharge.

into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (citations omitted)). Nonetheless, the Court is not persuaded that applying the common law principle of discharge in this case would relieve plaintiff of its obligation to permanently plug and abandon the 320-2 well. The common law principle of discharge applies only to obligations created by the particular contract at issue. *See* Restatement (Second) of Contracts § 237, cmt. e ("*Duties affected*: Under the rule stated in this Section, only duties with respect to the performances to be exchanged under the particular exchange of promises are affected by a failure of one of those performances. A duty under a separate contract is not affected . . . , nor is a duty under the same contract affected if it was not one to render a performance to be exchanged under an exchange of promises."). Although Lease 320 itself incorporates an obligation to remove all devices from the lease area upon termination, the OCSLA regulations - which are not being challenged by plaintiff - establish an independent obligation to permanently plug and abandon all exploratory wells. Plaintiff cites no authority in support of its position that the common law principle of discharge relieves the non-breaching party of <u>regulatory</u> obligations, and this Court declines to expand the scope of the

common law principle of discharge in that direction.[18]

The OCSLA regulations explicitly and comprehensively address the question of who bears decommissioning responsibilities and when those responsibilities accrue. Under 30 C.F.R. § 250.1702, the obligation to permanently plug and abandon a well accrues upon the drilling of a well or, as in Noble's case, upon becoming a lessee of a lease on which there is a well that has not been permanently plugged. Lessees and owners of operating rights are jointly and severally liable for meeting their decommissioning obligations for the facilities on the lease as the obligations accrue "and until each obligation is met." *Id.* § 250.1701(a). Once a lessee has accrued a decommissioning obligation, it retains that obligation, notwithstanding transfer, assignment, or relinquishment of the lease. *See id.* § 256.62(d) (addressing decommissioning obligations upon assignment); *id.* § 256.64(a)(5)

---

[18]     In *Amoco Production Co. v. Fry*, a district court in this Circuit held that the government was not obligated to refund excess oil and gas royalty payments, despite a clear statutory directive under the OCSLA, because of countervailing common law principles that allowed the government to use those overpayments to offset debts owed to them. 904 F. Supp. 3, 11-12 (D.D.C. 1995), *aff'd in part and rev'd in part on other grounds*, 118 F.3d 812 (D.C. Cir. 1997). Plaintiff has also cited to other cases where the application of the *Texas* doctrine reached a similar result. *See ABN AMRO Bank N.V. v. United States*, 34 Fed. Cl. 126, 132 (1995) (although Treasury regulations appear fairly comprehensive with respect to forged endorsements, the common law rules governing which entity bears the loss for a double forgery take precedence). From these cases, plaintiff reasons that the application of the *Texas* doctrine here would likewise relieve Noble of its decommissioning obligations under the OCLSA regulations. The Court finds this reasoning unpersuasive.

21

(addressing decommissioning obligations upon transfer); *id.*
§ 256.76 (addressing the effect of relinquishment on outstanding
decommissioning obligations). Indeed, the OCSLA regulations
specify that this duty survives even the termination of the
lease. *See id.* § 250.1710.

Plaintiff Noble is indisputably a lessee to whom
decommissioning obligations have accrued. As such, Noble shares
in the joint and several responsibility to permanently plug and
abandon the 320-2 well until that obligation is met. The Court
finds that this duty was not discharged as to Noble by the
government's breach of contract. Accordingly, the Court
concludes that MMS acted within the scope of its regulatory
authority under OCSLA to order Noble to permanently plug and
abandon the 320-2 well, and its September 1, 2009 order does not
violate the APA.

**IV. CONCLUSION**

For the reasons stated herein, it is hereby **ORDERED** that
plaintiff's motion for summary judgment is **DENIED.** It is further
**ORDERED** that the federal defendants' cross-motion for summary
judgment is **GRANTED.** A separate Order accompanies this
Memorandum Opinion.

**SO ORDERED.**

**SIGNED:**      **Emmet G. Sullivan**
             **United States District Court Judge**
             **March 22, 2011**